Barry I. Levy (BL 2190)
Michael A. Sirignano (MS 5263)
Justin A. Calabrese (JC 5436)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------X

GOVERNMENT EMPLOYEES INSURANCE COMPANY, GEICO INDEMNITY COMPANY, GEICO GENERAL INSURANCE COMPANY and GEICO CASUALTY COMPANY,

Plaintiffs,

-against-

ACCELERATED DME RECOVERY, INC. and ARTHUR PINKHASOV

the "DME Defendants",

RANDALL EHRLICH, M.D.,
KENNETH MCCULLOCH, M.D.
MARK KRAMER, M.D.,
STUART SPRINGER, M.D.
JASON BAYNES, M.D.

the "Physician Defendants".

-----------------------------------X

Docket No.: 16-132

**Plaintiffs Demand a Trial by Jury**

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company (collectively referred to hereinafter

as "GEICO" or "Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

## INTRODUCTION

1.     This action seeks to recover more than $129,000.00 that the Defendants wrongfully have obtained from GEICO by submitting, and causing to be submitted, fraudulent claims seeking payment for post-surgery rehabilitative medical equipment (e.g. continuous passive motion units and cold therapy units), which purportedly was provided to individuals who were involved in automobile accidents and were eligible for insurance coverage under GEICO insurance policies ("Insureds").

2.     In addition, GEICO seeks a declaration that it is not legally obligated to pay more than $1,100,000.00 in fraudulent claims submitted through Accelerated DME Recovery, Inc. ("Accelerated") because:

(i)     Accelerated made false and fraudulent misrepresentations to GEICO concerning the maximum permissible charges for rehabilitative medical equipment allegedly provided to Insureds in order to obtain from GEICO payment under the New York "No-Fault" laws to which they are not entitled;

(ii)     Accelerated made false and fraudulent misrepresentations to GEICO by submitting charges for rehabilitative medical equipment and devices that never were dispensed to Insureds;

(iii)     Accelerated participates in collusive relationships with various physicians which involve the prescription of medically unnecessary rehabilitative equipment in exchange for kickbacks and other financial considerations;

(iv)     Accelerated failed and/or refused to adequately provide full particulars of the nature and/or extent of the durable medical equipment and orthotic devices they purport to have supplied to Insureds.

3.     The Defendants fall into the following categories:

(i)     Accelerated is a New York corporation that purports to dispense post-surgery rehabilitative equipment to GEICO Insureds, mostly on a rental basis, and then systematically submit fraudulently inflated claims to GEICO and other New York automobile insurers for the durable medical equipment and orthotic devices

    (ii)    Defendant Arthur Pinkhasov ("Pinkhasov") is the purported owner of Accelerated.

            (Accelerated and Pinkhasov are sometimes hereinafter collectively referred to as the "DME Defendants".)

    (iii)   Defendants Randall Ehrlich ("Ehrlich"), Kenneth McCulloch ("McCulloch"), Mark Kramer ("Kramer"), Stuart Springer ("Springer") and Jason Baynes ("Baynes") are physicians licensed to practice medicine in New York who, in exchange for kickbacks and other financial consideration, routinely prescribe unnecessary post-rehabilitative medical equipment that is dispensed by Accelerated.

            (Ehrlich, McCulloch, Kramer, Springer and Baynes are hereinafter collectively referred to as the "Physician Defendants".)

    4.     As discussed below, the Defendants at all times have known that many of the claims for post-surgical rehabilitative medical equipment submitted to GEICO were fraudulent because: (i) the charges intentionally were inflated based upon an exploitation of the payment formulas set forth in New York's "No-Fault" laws; (ii) the claims misrepresented the nature and quality of the equipment that were actually provided; (iii) in many cases, the goods and related services billed to GEICO never were actually provided to the Insureds in the first instance and (v) the equipment provided was not medically necessary and prescribed only in a manner to generate profit.

    5.     As such, Accelerated does not now have – and never had – any right to be compensated for their claims for rehabilitative equipment.  The chart attached hereto as **Exhibit "1"** sets forth a representative sample of close to 1,000 fraudulent claims that have been identified to-date that Accelerated submitted, or caused to be submitted, to GEICO.  The Defendants' fraudulent scheme perpetrated against GEICO began in 2012 and has continued uninterrupted since that time as Accelerated continues to submit fraudulent claims and continues

to seek reimbursement from GEICO. As a result of the interrelated scheme, GEICO has incurred damages of more than $129,000.00.

## THE PARTIES

### I. Plaintiffs

6. Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

### II. Defendants

7. Defendant Accelerated is a New York corporation with its principal place of business at 88-11 101st Avenue, Ozone Park, New York. Accelerated purportedly provides various types of rehabilitative equipment to GEICO Insureds; however the medical equipment Accelerated purports to dispense is outdated, inferior and less expensive equipment that was purchased for much less than what is represented in the billing submitted by Accelerated. Accelerated was incorporated in July 2012 and from that time through the present day, knowingly has submitted fraudulent claims to GEICO and continues to seek reimbursement on hundreds of unpaid fraudulent claims.

8. Defendant Pinkhasov is a citizen of New York and owns and controls Accelerated.

9. Defendant Randall Ehrlich. MD ("Ehrlich") is a physician licensed to practice medicine in New York and who maintains a principal place of business New York. Ehrlich performs basic arthroscopic surgeries on GEICO Insureds and in exchange for financial or other consideration, prescribes post rehabilitative devices that are ultimately dispensed by Accelerated.

Not only is the equipment medically unnecessary in most circumstances, but the equipment is also prescribed for periods of time that far exceed their utility – even if prescribed for legitimate purposes.  Additionally, although Ehrlich maintains his practice in New York and treats New York residents, Ehrlich performs the unnecessary surgeries on the New York patients at surgical centers in New Jersey.

10.     Defendant Kenneth McCulloch, MD ("McCulloch") is a physician licensed to practice medicine in New York and who maintains a principal place of business in New York. McCulloch performs basic arthroscopic surgeries on GEICO Insureds and in exchange for financial or other consideration, prescribes post rehabilitative devices that are ultimately dispensed by Accelerated.  Not only is the equipment medically unnecessary in most circumstances, but the equipment is also prescribed for periods of time that far exceed their utility – even if prescribed for legitimate purposes.  Additionally, although McCulloch maintains his practice in New York and treats New York residents, McCulloch performs the unnecessary surgeries on the New York patients at surgical centers in New Jersey.

11.     Defendant Mark Kramer, MD ("Kramer") is a physician licensed to practice medicine in New York and who maintains a principal place of business in New York.  Kramer performs basic arthroscopic surgeries on GEICO Insureds and in exchange for financial or other consideration, prescribes post rehabilitative devices that are ultimately dispensed by Accelerated. Not only is the equipment medically unnecessary in most circumstances, but the equipment is also prescribed for periods of time that far exceed their utility – even if prescribed for legitimate purposes.  Additionally, although Kramer maintains his practice in New York and treats New York residents, Ehrlich performs the unnecessary surgeries on the New York patients at surgical centers in New Jersey.

12. Defendant Stuart Springer, MD ("Springer") is a physician licensed to practice medicine in New York and who maintains a principal place of business in New York. Springer performs basic arthroscopic surgeries on GEICO Insureds and in exchange for financial or other consideration, prescribes post rehabilitative devices that are ultimately dispensed by Accelerated. Not only is the equipment medically unnecessary in most circumstances, but the equipment is also prescribed for periods of time that far exceed their utility – even if prescribed for legitimate purposes. Additionally, although Springer maintains his practice in New York and treats New York residents, Springer performs the unnecessary surgeries on the New York patients at surgical centers in New Jersey.

13. Defendant Jason Baynes, MD ("Baynes") is a physician licensed to practice medicine in New Jersey and who maintains a principal place of business in New Jersey. Baynes performs basic arthroscopic surgeries on GEICO Insureds and in exchange for financial or other consideration, prescribes post rehabilitative devices that are ultimately dispensed by Accelerated. Not only is the equipment medically unnecessary in most circumstances, but the equipment is also prescribed for periods of time that far exceed their utility – even if prescribed for legitimate purposes.

**JURISDICTION AND VENUE**

14. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

15. Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

### I. An Overview of the No-Fault Laws and Licensing Statutes

16. GEICO underwrites automobile insurance in the State of New York.

17. New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101 et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65 et seq.) (collectively referred to herein as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

18. No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

19. An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary goods and medical services provided, using the claim form required by the New York State Department of Insurance (known as the "Verification of Treatment by Attending Physician or Other Provider of Health Service," or, more commonly, as an "NF-3"). In the alternative, healthcare providers sometimes submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

20. The No-Fault Laws obligate individuals and healthcare providers that seek payment of No-Fault Benefits to provide insurers with additional verification in order to establish proof of their claims.

21. The prescribed No-Fault policy endorsement set forth in 11 N.Y.C.R.R. § 65-1.1 provides, in part, that "upon request by the Company, the eligible injured person or that person's

assignee . . . shall (b) as may reasonably be required, submit to an examination under oath by any person named by the Company, and shall subscribe to same . . . , and (d) provide any other pertinent information that may assist the Company in determining the amount that is payable."

22. The prescribed No-Fault policy endorsement set forth in 11 N.Y.C.R.R. § 65-1.1 also states that "[n]o action shall lie against the Company, unless, as a condition precedent thereto, there shall have been full compliance with the terms of this coverage."

23. In addition, 11 N.Y.C.R.R. § 65-3.5 states, in pertinent part, that:

> (i) Subsequent to the receipt of one or more of the completed verification forms, any additional verification required by the insurer to establish proof of claim shall be requested within 15 business days of receipt of the prescribed verification forms. Any requests by an insurer for additional verification need not be made on any prescribed or particular form. . . .
>
> (ii) <u>The insurer is entitled to receive all items necessary to verify the claim</u> directly from the parties from whom such verification was requested.
>
> (iii) All examinations under oath . . . requested by the insurer shall be held at a place and time reasonably convenient to the applicant. . . . The insurer shall inform the applicant at the time the examination is scheduled that the applicant will be reimbursed for any loss of earnings and reasonable transportation expenses incurred in complying with the request. When an insurer requires an examination under oath of an applicant to establish proof of claim, such requirement must be based upon the application of objective standards so that there is specific objective justification supporting the use of such examination.

24. Because an examination under oath is a condition of coverage, an insurer may deny a healthcare provider's or individual's claim for No-Fault Benefits if the healthcare provider or individual claimant refuses to appear for (or complete) an examination under oath.

25. Pursuant to Section 403 of the New York State Insurance Law, the NF-3s and HCFA-1500 Forms submitted by healthcare providers to GEICO, and to all other insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing

> any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II. Regulations Governing Maximum Reimbursement for Durable Medical Equipment

26. Durable medical equipment generally consists of items that can withstand repeated use, and primarily consists of items used for medical purposes by individuals in their homes. Rehabilitative devices, a subgroup of DME, are post-surgical instruments that are used by physicians and/or patients to increase range of motion and/or speed up the healing processes. These devices can be utilized in physician offices or dispensed to patients for home use, either for purchase or on a rental basis, and include such items as Continuous Passive Motion Units ("CPMs") and Cryotherapy Units a/k/a Cold Water Circulation units ("CTUs").

27. The No-Fault Laws set forth maximum charges that may be submitted by healthcare providers for DME and orthotic devices. One of the primary purposes in limiting the maximum charges for DME and orthotic devices is to ensure that Insureds' $50,000.00 in maximum No-Fault Benefits are not artificially depleted by inflated DME and orthotic device charges. In a June 16, 2004 Opinion Letter, the New York State Insurance Department recognized the harm inflicted on Insureds by inflated DME and orthotic device charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.
>
> (A copy of the June 16, 2004 Opinion Letter is attached as **Exhibit "2."**)

28. Effective October 6, 2004, the maximum permissible charge for DME and orthotic devices is the fee payable for such DME under the New York State Medicaid program at the time such DME is provided. See 11 N.Y.C.R.R. (Appendix 17-C, Part F (a) (effective Oct 6, 2004)).

29. With regard to items dispensed *for purchase*, if the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable shall be the lesser of the acquisition cost (i.e., the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50 percent, or the usual and customary price charged to the general public. See 11 N.Y.C.R.R. (Appendix 17-C, Part F (a) (effective Oct. 6, 2004)).

30. With the subsequent enactment of 12 N.Y.C.R.R. § 442.2 (2011) it was noted that there was no further need for Appendix 17-C Part F since no-fault follows the Workers' Compensation Fee Schedule and therefore no-fault could adopt that fee schedule. As a result, 11 N.Y.C.R.R. 68 Appendix 17-C, Part F was repealed and 12 N.Y.C.R.R. § 44.2 was implemented. Nevertheless, pursuant to 12 N.Y.C.R.R. § 44.2 and the language in the Workers' Compensation Fee Schedule as it relates to durable medical states:

> (a) The maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, and orthotic and prosthetic appliances shall be the fee payable for such equipment or supplies under the New York State Medicaid program at the time such equipment and supplies are provided... If the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable, shall be the lesser of:
>
> > (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or
> >
> > (2) the usual and customary price charged to the general public.
>
> (b) The maximum permissible monthly *rental charge* for such equipment, supplies and services provided on a rental basis shall not exceed the lower of the monthly rental charge to the general public *or the price determined by the New York State Department of Health area office*. The total accumulated monthly rental charges shall *not exceed the fee amount allowed under the Medicaid fee schedule*.
>
> (c) The maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, and orthotic and prosthetic appliances and the maximum permissible monthly rental charge for such equipment, supplies, and services provided on

> a rental basis as set forth in subdivisions (a) and (b) of this section are payment in full and there are no separate and/or additional payments for shipping, handling, and delivery.

(A copy of 12 N.Y.C.R.R. § 44.2 is annexed hereto as **Exhibit "3."**)

31. Furthermore, the New York State Medicaid Department, the entity charged with the responsibility of establishing billing guidelines and calculations for the dispensation of DME, has published the Durable Medical Equipment Policy Guidelines ("the Guidelines") that specifically state:

> for DME that has not been assigned a Maximum Reimbursement Amount ("MRA"), the rental fee is calculated at 1/6th of the equipment provider's acquisition cost and that the total accumulated monthly rental charges may not exceed the purchase price of the product.

(A copy of the guidelines is annexed hereto as **Exhibit "4.")**

32. Additionally, as recently as July 2014, the New York State Department of Health issued an Opinion letter supporting the "1/6th Rule" (thus providing a basis for an insurer to request proof of the provider's acquisition cost) stated that "this policy" is disseminated to all providers and the general public in the Medicaid Durable Medical Equipment Provider Manual.

(A copy of the Opinion Letter in annexed hereto as **Exhibit "5."**)

33. Insurers such as GEICO are entitled to receive a proper proof of claim. See 11 N.Y.C.R.R. § 65-3.8(f). To be eligible for payment, a claim seeking reimbursement for DME and/or orthotic devices must include a description of the "full particulars of the nature and extent" of the items and services for which payment is sought. See 11 N.Y.C.R.R. § 65-1.1.

34. Despite GEICO's requests for additional verification to verify the nature of Accelerated's claims and the basis of its charges, Accelerated refuses to provide the information demanded by GEICO.

35.     In fact, since March 2012 Accelerated has consistently withdrawn arbitrations that it had filed against GEICO seeking reimbursement for the charges because Accelerated knows that it cannot substantiate the fraudulently inflated charges for the equipment.

**III.     Rental Equipment and the Defendant's Fraudulent Scheme**

36.     The number of DME rental companies has spiked in recent years as a result of the aggressive and successful fight against run of the mill DME fraud (*i.e.*, DME for purchase) and the purported uncertainty regarding the proper rate of reimbursement for non-fee schedule devices, such as CPMs and CTUs.  Due to the fact that the No-Fault law clearly outlines the reimbursement calculations related to the dispensation of goods for purchase, many DME providers closed their doors and re-opened under new identities – now dispensing and billing for the rental of post-surgical rehabilitative devices.

37.     As cited above, rental DME is governed by 12 N.Y.C.R.R. § 442 which establishes, in part, that "the maximum permissible monthly rental charge for [durable medical] equipment, supplies and services provided on a rental basis shall not exceed the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office. The total accumulated monthly rental charges shall not exceed the fee amount allowed under the Medicaid fee schedule."

38.     In accord with the statute, many insurers, including GEICO, request additional verification—typically the acquisition cost—from rental DME providers in order to determine if the total accumulated monthly rental charges exceed the fee amount allowed under the Medicaid Fee Schedule. Many rental companies, however, either refuse to provide the requisite information or simply object to the requests on the basis that they are not required to proffer such materials. These companies take the position that the statutory language pertaining to the New York State Department of Health area office is inoperable as the Department of Health, until July

2014, has made no price determination and, on that basis, they are entitled to charge the usual and customary fee charged to the general public for such devices. Additional verification with respect to the usual and customary fee entails producing only literature or other evidence of the proper fee, not an invoice. Of course, when DME rental providers do supply such literature, it is based on charges levied by other fraudulent rental companies throughout the New York metropolitan area.

39.   Beginning in 2012 and continuing through to the present day, the Defendants masterminded and implemented various schemes through which they wrongfully obtained more than $129,000.00 from GEICO through the submission of fraudulent claims for post-surgical rehabilitative devices. To date, the Defendants have submitted more than $1.1 million in fraudulent charges to GEICO. Although more than $129,000.00 has been paid, there is more than $1,100,000.00 in pending claims that have yet to be adjudicated.

40.   The fraudulent scheme perpetrated by the Defendants involves the participation of Accelerated, medical clinics, wholesale companies, other CPM and CTU retailers and of course, various physicians and/or surgeons who prescribe the devices in the first instance, i.e., the Physician Defendants.

41.   Upon information and belief the DME Defendants pay kickbacks to the Physician Defendants who perform surgical procedures to individuals who were injured in motor vehicle accidents, including GEICO Insureds. The injured victims first visit No-Fault multi-disciplinary clinics and are then referred by the clinic managers to specialists, e.g., Physician Defendants (in exchange for kickbacks) for various surgical procedures. The procedures typically performed by these "specialists" are basic joint procedures, i.e., diagnostic arthroscopies, synovectomies and meniscectomies.

42. The Physician Defendants arrange to have their New York patients shipped to New Jersey surgical facilities to perform the unnecessary procedures because by performing the surgeries in New Jersey, the Physician Defendants can claim that the procedures are not subject to the fee limitations set forth in the Fee Schedule.

43. Despite the fact that the procedures that are performed by the Physician Defendants are basic joint procedures requiring none to minimal amounts of post-surgical rehabilitation, the Physician Defendants prescribe various types of post-surgical rehabilitative devices including CPMs, CTUs and other types of orthotic equipment (i.e., ankle supports, knee supports and shoulder supports).

44. The literature relating to the use of CPMs has consistently concluded that CPMs are only potentially useful in a limited number of circumstances such as total knee or shoulder replacements and repair of an anterior cruciate ligament (and even in that instance, only until the patient begins physical therapy treatment) – not the basic arthroscopic surgical procedures that were performed by the Physician Defendants on virtually every insured. Moreover, even when necessary, the use of CPMs should be limited to 7-10 days because there are no long-term benefit to patients as compared to patients who receive traditional physical therapy. Examples of the literature include the following:

- In a study published in the March-April 1992 *American Journal of Sports Medicine*, 75 patients who underwent anterior cruiciate ligament ("ACL") repair (reconstruction) were randomized into one of three groups: (i) the active motion group, which received physical therapy three times a week; (ii) the hybrid group, which received physical therapy and CPM and (iii) the CPM group, which received CPM but no physical therapy. The authors reported no statistically significant differences among the three groups in medication usage, hospital length of stay, or in any other outcome measures.

- In a study published in the November 1997 *Journal of Bone and Joint Surgery*, 53 patients (57 knees) were allocated to different postoperative regimes – no CPM and CPM. Those in the CPM groups had CPM for 48 hours and all patients had an identical regime of physiotherapy. Although at one week, there was an increase in the range of flexion and total range of movement in the CPM group compared with the no-CPM

group, after one week, there were no significant differences in flexion, overall range of movement, or functionality.

- In a study published in the July 1998 *Journal of Bone and Joint Surgery*, 31 patients who underwent rotator cuff repair, were randomly assigned to CPM or manual passive range-of-motion exercises. Using generally medically accepted scales, the level of pain decreased in both groups, but there was (i) no significant difference in the mean scores in each group and (ii) no significant difference in range of motion or strength. There was no significant difference between both CPM and manual passive range-of-motion.

- In a study published in the April 2001 *Journal of Arthroplasty*, 26 patients who had unilateral knee arthroplasty were randomized to receive CPM or immobilization in the first week. The two groups of patients were comparable in demographic data and preoperative knee range of motion. In 17 patients who had one-stage sequential bilateral arthroplasties, one side had CPM and the other side was immobilized. The active knee ROM group was then was assessed and compared to the immobilization group and it was determined that there was no difference in the patients' conditions after seven days.

- The May 2007 *Annales de* Réadaptation *et de Médecine Physique* included a systematic review of the literature regarding the use of CPM after total knee arthroplasty in order to develop clinical practice guidelines. After analysis of 21 studies included in the review, the authors determined that CPM after total knee arthroplasty could have short-term beneficial influence on the speed of recovery of motion, early flexion, postoperative pain, knee swelling and length of hospital stay – but found no long-term confirmation of the early benefit of CPM. The authors concluded that, there is insufficient evidence to recommend substituting CPM for other modalities of rehabilitation following total knee arthroplasty.

- In a study published in the April 29, 2008 *BMC Musculoskeletal Disorders*, 60 patients who underwent total knee arthroplasty were randomly assigned to an "experimental" group treated with CPM and physical therapy for 17 consecutive days or to the "usual care" group treated with approximately four days of CPM and physical therapy, followed by physical therapy alone for two weeks after discharge. From 18 days to three months after surgery, both groups received physical therapy alone. The only statistically significant difference between the two groups which favored the experimental group was in range of motion at the time of discharge however no significant difference in range of motion was noted at any other assessment period. This study suggests that prolonged use of CPM may have short-term effects on range of motion but this did not translate into improved function nor did the improvement continue into the long-term.

These studies demonstrate that although CPM machines may have some short-term effect on patients who undergo serious joint surgeries by helping them to attain a somewhat faster recovery, CPM machines offer no benefit to patients who undergo minor procedures and that

CPM machines provide no long-term benefit to patients. These studies also show that positive impact associated with the use of a CPM machine – if any – evaporates shortly after surgery.

45.     Notwithstanding the absence of any support for their use, the Physician Defendants who perform basic arthroscopic procedures subsequently prescribe CPMs for use by Insureds for periods of time ranging from 6 to 8 weeks.  The fraudulent prescriptions, in turn, result in the Defendants' submission of the fraudulent charges to GEICO.

46.     Similarly, CTUs offer no real benefit over simple ice-packs or no cold therapy whatsoever and even when prescribed, cold therapy, generally, should be limited to 3-4 days post-surgery.  For example:

- In a study published in the January 2008 *Journal of Knee Surgery*, the researchers examined compared postoperative pain control after knee arthroscopy in 53 patients with use of a CTU device (the "Polar Care 500") compared with a traditional ice therapy regimen.  Although pain intensity was found to be similar between groups throughout the course of the study, there were no significant differences found in the groups regarding functional ability.

- In studies published in the 2001 *International Orthopaedics*, the 1998 *Journal of Orthopaedic & Sports Physical Therapy*, the 1996 *American Journal of Sports Medicine*, and the 1994 *Clinical Orthopaedics and Related Research*, no clinical difference was seen in pain or analgesic use between ACL repair or total knee arthroplasty patients who used CTU machines and patients who used nothing, or who used simple compression bandages.

- In the July 2001 *International Journal of Sports Medicine*, the author conducted a systematic review of the literature that examined use of cryotherapy in acute soft tissue injury and attempted to produce evidence-based guidance on treatment. The review examined the effectiveness of ice in reducing tissue temperature, different methods of ice application, differing temperature, and duration to and the depth of the cooling effect. The study's conclusion noted that the optimal method of ice application is wet ice applied directly to the skin through a wet towel and that the target temperature reduction is to 10–15 °C. While there was no evidence from the literature suggesting an optimal frequency or duration of treatment, it appeared that repeated ice applications of 10 minutes each were effective.

- In a study published in the September-October 1996 *American Journal of Sports Medicine*, 110 patients were followed to assess the effectiveness of postoperative cold therapy in patients who underwent ACL reconstructions. Group I received treatment with the Polar Care device filled with ice water; Group II received the Polar Care device filled

with lukewarm tap water; Group III was treated with 1.3–1.5 kg bags of crushed ice, changed every four hours; and Group IV, the control group, received no cold therapy. The authors concluded that ice bags and cooling pads appeared equally effective.

- In a retrospective study published in the 1995 *American Journal of Knee Surgery*, 52 patients who underwent total knee arthroscopy were reviewed. Of these patients, 33 received cold therapy and 19 did not. No significant difference amongst the groups was detected in amount of narcotics used or length of hospital stay.

These studies show that CTUs offer no additional benefit to patients beyond the benefits of traditional ice therapy (cold packs and compression). Notwithstanding the absence of any support for their use, the Physician Defendants who perform basic arthroscopic procedures subsequently prescribe CTUs for use by Insureds for periods of time ranging anywhere between 2 to 4 weeks.

47. As a result of the fraudulent prescriptions, the DME Defendants submit fraudulent charges to GEICO, ranging from $75.00 to $85.00 per day for CPMs for an average of 42 days per patient resulting in charges of $3,150.00 and $3,570.00 per patient. A representative sample of the prescriptions and the fraudulent billing for CPMs submitted by the DME Defendants is annexed hereto as **Exhibit "6".**

48. Independent pricing research and interviews with owners/employees of legitimate national rental companies have revealed that the same types of CPMs that are rented by the DME Defendants at $92.00 per day are customarily rented for mere fractions of their inflated charges.

49. Similarly, the DME Defendants submit fraudulent charges to GEICO of $179.01 for CTUs for an average of approximately 14 days. The very same CTUs rented by the DME Defendants are available to rent for mere fractions of the DME Defendants' inflated charges and are even available for *lifetime purchase* for less than $200.00. A representative sample of the prescriptions and the fraudulent billing for CTUs submitted by the DME Defendants is annexed hereto as **Exhibit "7"**.

50.     Although the DME Defendants rent the CPMs for 6 to 8 weeks and CTUs for 2 to 4 weeks, most of the Insureds: (i) never used the devices because they were inconvenient and not practicable to use (ii) never used the devices because the patients were already receiving office-based therapy and/or (iii) stopped using the devices well before the expiration of the rental periods.  As part of its scheme, Accelerated then bills GEICO and other insurers for the entire rental period rather than for the time that the equipment is actually used by the patients.

51.     Even worse – the innocent Insureds are never even made aware that companies like Accelerated are drastically reducing whatever benefits remain on their individual $50,000 policies because the Insureds are never told how much the devices cost and are never given the prescriptions to fill themselves.

52.     To avoid suspicion and detection, the DME Defendants devised a plan to rent the devices to Insureds and permit the DME Defendants to repossess the equipment before GEICO is even made aware that the equipment was in fact dispensed to GEICO's Insureds.

53.     In exchange for kickbacks and other financial consideration, the Physician Defendants not only prescribe the unnecessary equipment for extensive time periods, but as part of the scheme, they also route the prescriptions for the equipment directly to the DME Defendants to ensure that the Insureds do not fill the prescriptions with legitimate DME retailers. These financial considerations include luxurious lunches and dinners and upon information and belief also include the sale of other forms of equipment (lumbar supports, cervical collars and other orthotics) at discounted rates.  The DME Defendants are able to fund the kickbacks and the discounts give to the Physician Defendants by severely overcharging GEICO and other insurers for the rental of the CPMs and CTUs.

54.     To ensure that the scheme operates as planned, the DME Defendants actually create pre-printed prescription forms and deliver the prescription forms to the Physician

Defendants. To make it "easier" for the Physician Defendants, the pre-printed prescription forms already contain the types of devices to be dispensed, language supporting the purported medical necessity for the devices and the length of time that the devices are intended to be rented to the patients. Although some of the prescriptions indicate various rental periods, each rental period is well beyond what is medically acceptable and necessary for the patient to recover from the surgeries performed.

55. Demonstrative of the fact that Pinkhasov incorporated Accelerated solely to be used as a conduit through which he intended to defraud GEICO and other insurers, and further evidence of Pinkhasov's and Accelerated's fraudulent concealment, is testimony provided by Pinkhasov during an examination under oath intended to verify Accelerated's billing scheme:

- Pinkhasov testified that he was a barber by trade and later incorporated Accelerated to bill Medicare and Medicaid patients. Furthermore, although he was not yet approved by the Government to bill Medicare and Medicaid, Accelerated's business primarily services no-fault patients (70%) and some workers' compensation patients (30%).

- Pinkhasov purportedly purchases CTUs and CPMs from Ebay and online wholesalers DJO and Medsource.

- Pinkhasov testified that Accelerated dispenses Optiflex Shoulder CPMs and Aqua Relief CTUs, testified that he pays $4,000.00 for a CPM unit and $1,300.00 – $1,400.00 for a CTU unit, yet failed to produce any invoices at the EUO to corroborate his testimony.

- When asked why duplicative invoices were provided to GEICO in connection with various bills, Pinkhasov testified that they were merely sample invoices and that the invoices for all the specific DME in question would be produced after a written request for further verification. Of course, Pinkhasov never produced the materials.

- Pinkhasov often courted prescribing physicians by hosting exotic lunches and dinners;

- Pinkhasov bases the daily rental charge on his research of the "usual and customary rates" for such devices and he derived the rental charges from an Optimum DME pricing manual (which applies to Medicare) and based on his conversations with his attorney – William Purdy of Israel, Israel & Purdy. He did

not produce the Optimum book at the EUO and failed to provide the materials. A copy of the materials were requested in writing but were never produced.

- Pinkhasov was aware that the CPM machines are available for purchase for *less* than what Accelerated is charging for a rental and was aware that CPM dealers like the Medcom Group, charge approximately $41.07 per day for the use of shoulder CPM Units – less than half the amount charged by Accelerated.

A copy of the EUO transcript is attached hereto as Exhibit "8".

56.     In order to maximize the fraudulent charges that the DME Defendants could submit to GEICO and other insurers, Pinkhasov purchased used or refurbished equipment from various manufacturers or wholesalers.

57.     Much of the equipment can be purchased, *for life*, on the internet or from legitimate companies for less than the DME Defendants' monthly charges for the particular items.

58.     Nevertheless, the DME Defendants systematically represented that the inexpensive units ultimately dispensed to GEICO Insureds were high-quality, expensive units by submitting monthly charges that exceeded the true value of the products.

59.     The DME Defendants then created and submitted thousands of bills deliberately omitted any meaningful information regarding the DME and orthotic devices, including the manufacturer, make and model of the equipment that the DME Defendants purportedly dispensed to Insureds.

60.     The DME Defendants' creation and submission of such generic billing prevented GEICO and other insurers from identifying the manufacturer, make and model of the equipment purportedly dispensed to each particular GEICO Insured and in virtually every instance, charged GEICO and other insurers far more than the maximum permissible amounts for the equipment that was supplied.

61. To further conceal the scheme, the DME Defendants failed to fully respond to GEICO's repeated requests for additional information such as meaningful wholesale invoices containing descriptions of goods provided (i.e., make, model and manufacturer) to each particular GEICO Insured and additional information necessary to determine the basis of the DME Defendants' calculations and whether the charges submitted by the DME Defendants were legitimate, or the byproducts of financial relationships between the DME Defendants and the Physician Defendants.

62. The DME Defendants' failure to provide verification is a necessary component of the fraud perpetrated by the DME Defendants because if the DME Defendants actually present proof of its purchase price, the DME Defendants would be reimbursed in accordance with the $1/6^{th}$ Rule and would not be entitled to the excessive charges that it systematically submits to GEICO.

**IV. The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

63. The Defendants legally and ethically are obligated to act honestly and with integrity in connection with the provision of DME and orthotic devices to Insureds, and their actual submission of charges to GEICO.

64. To induce GEICO to promptly pay the charges for the rehabilitative devices, the Defendants have gone to great lengths to systematically conceal their fraud. Specifically:

(i) The Physician Defendants prescribed medically unnecessary rehabilitative equipment for extensive rental periods beyond generally accepted medical practices.

(ii) The DME Defendants systematically and deliberately refused to provide information regarding the manufacturer, make and costs for the units they purportedly dispensed to each particular GEICO Insured.

(iii) Although the DME Defendants submitted delivery receipts in support of their billing that purported to demonstrate that the units were utilized by the Insureds, the Insureds never actually used the devices for the duration

identified in the receipts.  Instead, the DME Defendants merely delivered the equipment to the Insureds, advised the Insured's that the Insureds were required to hold the equipment for duration indicated on the prescription and then picked up the equipment at the expiration of the pre-determined rental period.

(iv)    The DME Defendants' fraudulent concealment also is manifest in their failure to disclose the existence of the kickback arrangements with the Clinics and specialists who prescribe the devices.

(v)    Once GEICO began to suspect that the DME Defendants were engaged in fraudulent billing and treatment activities, GEICO requested that the DME Defendants submit additional information regarding the wholesale prices, descriptions the units (i.e., make and model), proof of payment and documentation necessary to determine whether the charges submitted through Accelerated were legitimate.  Nevertheless, in an attempt to conceal their fraud, Accelerated systematically failed and/or refused to adequately respond to repeated requests for verification of the charges submitted through Accelerated.

65.    To induce GEICO to promptly pay the fraudulent charges, the DME Defendants routinely file expensive and time-consuming litigation against GEICO and other insurers if the fraudulent charges are not promptly paid in full, despite the fact that the DME Defendants are aware that their billing and claims are fraudulent.

66.    GEICO is under a statutory and contractual obligation to promptly and fairly process claims within 30 days.  The documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations, omissions, and acts of fraudulent concealment described above, were designed to and did cause GEICO to justifiably rely on them.  As a proximate result, GEICO has incurred damages of more than $129,000.00 based upon the fraudulent charges.

67.    Because of the material misrepresentations and other affirmative acts taken by the DME Defendants to conceal their fraud from GEICO, GEICO did not discover and should not reasonably have discovered that their damages were attributable to fraud until shortly before it filed this Complaint.

68. GEICO maintains standard office practices and procedures that are designed to and do ensure that no-fault claims denial forms or requests for additional verification of no-fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

69. In accordance with the No-Fault Laws, and GEICO's standard office practices and procedures, GEICO either: (i) timely and appropriately denied the pending claims for No-Fault Benefits submitted through Accelerated; (ii) timely issued requests for additional verification with respect to all of the pending claims for No-Fault Benefits submitted through Accelerated, yet failed to obtain compliance with the request for additional verification; or else (iii) the time in which to deny the pending claims for No-Fault Benefits submitted through Accelerated, or else to request additional verification of those claims, has not expired.

**AS AND FOR THE FIRST CAUSE OF ACTION**
**Against Accelerated**
**(Declaratory Judgment Under 28 U.S.C. § 2201)**

70. GEICO repeats and realleges each and every allegation contained in Paragraphs 1 through 69 of this Complaint as if fully set forth at length herein.

71. There is an actual case in controversy regarding more than $1,100,000.00 in fraudulent billing for post-surgical rehabilitative equipment that allegedly have been provided to GEICO's Insureds.

72. GEICO contends that Accelerated has no right to receive payment for any pending bills they have submitted because:

(i) the DME Defendants made false and fraudulent misrepresentations to GEICO concerning the maximum permissible charges for the medical equipment they allegedly provided to Insureds in order to induce GEICO into paying Accelerated "No-Fault" reimbursement to which the DME Defendants were not entitled;

(ii) the DME Defendants made false and fraudulent misrepresentations to GEICO by submitting charges for medical equipment that never was dispensed and/or actually intended to be utilized by Insureds for the duration for which the DME Defendants seek reimbursement from GEICO;

(iii) the DME Defendants' charges are the byproducts of kickbacks to the Physician Defendants and predetermine protocols that involved the prescription of medically unnecessary rehabilitative medical equipment; and

(iv) the DME Defendants failed and/or refused to adequately respond to GEICO's proper requests for additional verification, thereby breaching a condition of coverage and relieving GEICO of any obligation to pay the fraudulent claims.

73. In addition, GEICO contends that Accelerated has no right to receive payment for any claims beyond 1/6th per day of the DME Defendants' acquisition cost per device because that rate of reimbursement supports the policy adopted by and proscribed by the New York State Department of Health and the New York State Medicaid Department.

74. Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that:

(i) the DME Defendants have no right to receive payment on any pending bills submitted to GEICO because they knowingly made false and fraudulent misrepresentations to GEICO concerning the maximum permissible charges for the medical equipment they allegedly provided to Insureds in order to induce GEICO into paying the DME Defendants "No-Fault" reimbursement to which they were not entitled;

(ii) the DME Defendants have no right to receive payment on any pending bills submitted to GEICO because they knowingly made false and fraudulent misrepresentations to GEICO by submitting charges for equipment that never was dispensed and/or actually intended to be utilized by Insureds for the duration for which the DME Defendants seeks reimbursement from GEICO;

(iii) the DME Defendants' charges are the byproducts of kickbacks to the Physician Defendants who prescribe unnecessary medical equipment;

(iv) the DME Defendants failed and/or refused to adequately respond to GEICO's proper requests for additional verification, thereby breaching a

condition of coverage and relieving GEICO of any obligation to pay the fraudulent claims; and

(v) the DME Defendants are not entitled to reimbursement on any claims beyond 1/6th per day of its acquisition cost from their wholesaler or manufacturer and therefore, proof of purchase is a necessary component of Accelerated's proof of claim.

**AS AND FOR THE SECOND CAUSE OF ACTION**
**Against Pinkhasov and Accelerated**
**(Common Law Fraud)**

75. GEICO repeats and realleges each and every allegation contained in Paragraphs 1 through 74 of this Complaint as if fully set forth at length herein.

76. Accelerated and Pinkhasov intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for post-surgical devices.

77. The false and fraudulent statements of material fact and acts of fraudulent concealment include:

(i) In every claim for post-surgical devices, the representation that Accelerated's total accumulated monthly rental charges for equipment did not exceed the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office.

(ii) In every claim for post-surgical devices, the representation that Accelerated's total accumulated monthly rental charges for equipment did not exceed the fee amount allowed under the Medicaid fee schedule.

(iii) In every claim for post-surgical devices, the representation that the charges in the billing submitted to GEICO actually represented the duration for which GEICO's Insureds actually used the equipment.

(iv) The concealment of the fact that the equipment was prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby Accelerated and Pinkhasov paid kickbacks to the Physician Defendants to induce the Physician Defendants to: (a) prescribe the unnecessary medical equipment; (b) to transmit the prescriptions directly to the DME Defendants to prevent the Insureds from renting the devices from legitimate and less-expensive retailers and (c) prescribe the unnecessary medical equipment for durations that far exceed their medical utility – all of which was designed to permit Accelerated and Pinkhasov to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to GEICO and other New York automobile insurers.

78. Accelerated and Pinkhasov made false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges that were not compensable under the No-Fault Laws, or that were far in excess of the charges that otherwise would be compensable under the No-Fault Laws.

79. GEICO justifiably relied on the false and fraudulent representations made by Accelerated and Pinkhasov, and as a proximate result has incurred damages of more than $129,000.00 based upon the fraudulent charges.

80. The extensive fraudulent conduct of Accelerated and Pinkhasov demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

81. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**AS AND FOR A THIRD CAUSE OF ACTION AGAINST**
**Against Pinkhasov and Accelerated**
**(Unjust Enrichment)**

82. GEICO repeats and realleges each and every allegation contained in Paragraphs 1 through 81 of this Complaint as if fully set forth at length herein.

83. As set forth above, Accelerated and Pinkhasov engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

84. When GEICO paid the bills and charges submitted by or on behalf of Accelerated for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the improper, unlawful, and/or unjust acts of Accelerated and Pinkhasov.

85. Accelerated and Pinkhasov have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

86. Retention of GEICO's payments by Accelerated and Pinkhasov violates fundamental principles of justice, equity and good conscience.

87. By reason of the above, the Accelerated and Pinkhasov have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $129,000.00.

**AS AND FOR THE FOURTH CAUSE OF ACTION**
**Against Ehrlich, McCulloch, Kramer, Springer and Baynes**
**(Aiding and Abetting Fraud)**

88. GEICO repeats and realleges each and every allegation contained in Paragraphs 1 through 87 of this Complaint as if fully set forth at length herein.

89. Defendants Ehrlich, McCulloch, Kramer, Springer and Baynes knowingly aided and abetted the fraudulent scheme perpetrated on GEICO by Accelerated and Pinkhasov. The acts taken by Ehrlich, McCulloch, Kramer, Springer and Baynes in furtherance of the fraudulent scheme included: (i) knowingly prescribing post-surgical rehabilitative equipment after basic arthroscopic surgeries, (ii) knowingly prescribing post-surgical rehabilitative equipment for extensive periods of time which exceed any medical utility for such equipment; and (iii) knowingly receiving financial and/or other consideration from Accelerated in exchange for the prescriptions provided to Accelerated.

90. The conduct of Ehrlich, McCulloch, Kramer, Springer and Baynes in furtherance of the fraudulent scheme was significant and material. The conduct of Ehrlich, McCulloch, Kramer, Springer and Baynes was a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Accelerated

and Pinkhasov to obtain fraudulently inflated payments from GEICO and from other New York automobile insurers

91. Ehrlich, McCulloch, Kramer, Springer and Baynes aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges for DME and orthotic devices that were not compensable under the No-Fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

92. The conduct of Ehrlich, McCulloch, Kramer, Springer and Baynes caused GEICO to pay money based upon the fraudulent charges submitted through Accelerated in an amount to be determined at trial, but in no event less than $129,000.00.

93. The extensive fraudulent conduct of Ehrlich, McCulloch, Kramer, Springer and Baynes demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

94. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**JURY DEMAND**

95. Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor and against the Defendants, as follows:

A. On the First Cause of Action, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that: (i) Accelerated has no right to receive payment for any pending bills submitted to GEICO totaling no less than $1,100,000.00 and (ii) the maximum

amount of reimbursement for post-surgical rental equipment shall not exceed 1/6th per day of a medical provider's acquisition cost;

B. On the Second Cause of Action against Accelerated and Pinkhasov, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $129,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

C. On the Third Cause of Action against Accelerated and Pinkhasov, more than $129,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

D. On the Fourth Cause of Action against Ehrlich, McCulloch, Kramer, Springer and Baynes, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $129,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper.

Dated: Uniondale, New York
January 8, 2016

RIVKIN RADLER LLP

By:____________________________

Barry I. Levy (BL 2190)
Michael A. Sirignano (MS 5263)
Justin A. Calabrese (JC 5436)
926 RXR Plaza
Uniondale, New York 11556-0926
RR File: 5100-1016
Telephone: (516) 357-3000
Facsimile: (516) 357-3333

*Counsel for Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company GEICO General Insurance Company and GEICO Casualty Company*